Good morning, everyone. Welcome to the Illinois Appellate Court, 1st District, 1st Division. We'll ask that the lawyers who are going to argue to step up, introduce themselves, and tell us whom you represent. Good morning. My name is Jeff Hagen, and I represent the defendants, All About Drapes, and Richard Latticer. When I speak, I'll probably refer to him as Rick. Okay. Good morning, Your Honors. Don Wilson, and I'm here to appear on behalf of the defendant. Okay. Thank you, Counsel. Under Illinois Supreme Court Rule 352B, each side has 20 minutes for the main argument. The appellant has 10 minutes for rebuttal. We may change that as it goes along if things get repetitive or if we have a lot of questions. Please remember to speak loudly. Our microphones do not amplify very well, but merely are here to record what's being said. And please understand, we have read the briefs. We are very familiar with the facts of the case. So devote your time to your strongest arguments. All right. Mr. Hagen. Okay. Like you said, I think the facts in the briefs are fairly consistently provided across both briefs. But I wanted to take one minute to give a little background to the situation. In 2008 and 2009, the U.S. economy was experiencing one of the worst meltdowns. This is part of the record, though, Counsel. It is. All right. It's part of one of the two of the claims. I'd say three of the claims. So there was a difficult situation. There was bailouts of banks. The U.S. government stepped in and bailed out various banks, including providing bailout funds to a number of large banks, including Bank of America. And all of that was paid back, wasn't it? All of it was paid back. Okay. So what does it matter? No, well, it brings up why it has an impact on this situation. All of Mt. Drapes had a line of credit with LaSalle Bank. You pretty much know the facts, Counsel. I've got to tell you. Can we get to the April 11th, 2014 order? Is that part of your appeal? April 11th order. That would be the judge's decision to dismiss the counterclaims. Right. Right? Yes. One was based, one had to do with, I'd hate to call him Rick. I don't know the man, but what's his name? Richard Latticer. Latticer, yes. Mr. Latticer. One dismissal had to do with his claims against him or his claims and one had to do with All About Drapes, right? Yes. One was 2619 and one was 2615. Correct. So on the one that was the 2615, failure to state a claim. Yes. That was entered against All About Drapes? No. It was entered against Mr. Latticer. Okay. Claiming that he had no damage, he could claim no damages. On the grounds that he had no damage. All right. But, again, my question is, on the 2615 motion, failure to state a claim, did he say in his counterclaim that he sustained damages? Yes, I believe he did. Obviously, he said he lost his company. He had a company that had been in operation for many years, 14 employees, as a result of them adding a maturity date to a loan that did not have a maturity date. Right. So did the attorney court say your counterclaim says nothing about damages or you'd never be able to prove it? Well, he said you could as I understood it, the court said you could not prove damages because he had guaranteed the loan. But at this point, is that the issue, what you can prove, or what's in your counterclaim at this point on the 615? It's what's in the allegations. Right. So it was in your allegations, wasn't it? It was. Damages were in the allegations, but the judge said you couldn't even prove damages because he had guaranteed the loan and all he was liable for was the amount of the loan, and therefore how could he claim damages? Okay. And on the 615, what's the standard review on that? It's de novo. De novo, right. Okay. Now, the other one was the 2619 then. Yes. And the court ruled on that saying that the 2619 motion was the fact that he became the guarantee or guarantor or whatever on the modification, which blew all the claims. Is that right? Yeah, the court said that the modification agreement, the December 9, 2009 agreement, and we admit we signed it, that that agreement obviously had, it was a modification of an agreement that was made in July of 2009, and it included in that document a release. Right. So that was the basis for the 2619. It was. Is that a de novo review as well? It is. Yes. Okay. So the court in its ruling on the 2619, what information did it have about what was contained in the Bank of America, you know, agreement, the original agreement for the line of credit, as to when that matured? As I understood it, the court agreed that there was no maturity date. I have a snippet from a hearing where the court admitted and the bank has admitted that they unilaterally added maturity dates to all of these loans. So as I understood it, the court agreed that there was no maturity date. But I guess the reason the court felt that it was, first of all, that was where it was confusing because if you look at the court's, I believe it's in the April 11th order, the court said all the bank did was demand that he pay the amount that was due. The full balance as opposed to 2% per month. So that gave me the impression, or the implication is that the court felt that that August 5th, 2009, maturity date was a valid date. But at the same time, the court indicated that it was aware of and knew that the bank had admitted that they actually added those maturity dates when the loans came over from LaSalle Bank. So I never really understood how the judge could say that and then at the same time say that the loan was actually due on August 5th, 2009. That's the way I read the judgment. Let's go to the May 18th order where the court issued partial summary judgment on the liability issue against. All about grapes only. Was there a hearing? We did have a hearing. And I believe there is a, I'm pretty sure there is in the record a transcript of that hearing. There was a court report of that hearing. Thank you. Your case relies primarily on the issue of the bank unilaterally changing the terms of the loan when Bank of America took over LaSalle. And this is my problem with your case. There's not a mystery as to what the loan document said. It's a written document, right? It's in the record, right? And that written document in the record has no termination date. It allows the borrower to pay 2% for as long as it takes to pay off the loan in full, right? Right. And it also allows either Bank of America as successor or LaSalle to terminate the agreement with 30 days notice. And assuming there's a balance due, that termination only has the effect of stopping further draws. Is that right? That's correct. Okay. Because the parties agree it was not a demand instrument. So Bank of America takes over and decides we don't like this kind of business. And let's say it did this terrible bad thing and told its customers we're calling it in, but without using the 30 days. All right. But simply saying, you know, we're declaring the entire balance due now, which is contrary to the terms of the loan. Right. So your client calls all around the country to countless executives at Bank of America trying to track down this mysterious term that doesn't exist and he knows doesn't exist. But your cause of action is based on, you know, this trick that was played on him. That's fraudulent inducement. Right? But your client knew all along what the terms of the loan said and it wasn't in the terms of the loan. So how is he fraudulently induced? What's the issue of fact that stops it from losing? Our affirmative defenses to their claims are fraudulent inducement. Okay. Because, in addition. Because your client signed the second sort of, as I see it, your client had a choice. If your client was so darn sure Bank of America was wrong, he should have said, you're wrong. Declare it due and sue me and I'll have a perfect defense because here's the terms of the loan, Judge. It doesn't say they can declare it due. Your client didn't do that. Instead he settled with them and got the consideration of getting the ex-wife out of the deal. Right? Well, two points I guess I'd make on that is, when they said that there was a maturity date on that loan, that was one of their misstatements. They also said that the bank had documents to support the bank's claimed maturity date, that the bank would provide the defendants with copies of the documents evidencing the maturity date, that the bank would terminate the line of credit on August 5th, 2009, and demand immediate payment of the outstanding balance on that date, and that the bank would take legal action against him and the other guarantor, Rick and the other guarantors, if it wasn't paid by the maturity date. So he had a number of things thrown at him. So what his thought was, well, I will go ahead and sign it myself, not with the other guarantors, and in the meantime, I will continue to ask for that documentation. And there is in the record. You make that point, but the problem is, you know, in the law, we deem valid what people sign. And trying to get out of things you've signed based on coercion is virtually impossible under Illinois law. You have to show there was some sort of a wrongful conduct. How is it wrongful if your client has all the information right in front of him which says that they're wrong? Well, at the time he signed the second LOC, what I call the second LOC in July 2009, he didn't have all the information. They said here. He didn't have a copy of his own loan document. Well, he certainly had that. He testified in his deposition he knew that the bank was wrong. Yes, but what causes a fraudulent inducement is a reasonable reliance on what they're saying. He reasonably relied when he said to them, there is no date. There's no date in the agreement. Show me the agreement. They said, well, we have another document. And it has the date on it. Is that in the record? Who from the bank said that? How is it in the record? It's in his affidavit. And there's no counter affidavits. The bank offered no counter affidavits, no responses to the affirmative defenses. So it is in the record. It's in his affidavit. Is it your position in this case that the second agreement is void because of coercion? Fraudulent inducement or both or either? Yes. It's void because of a number of reasons. Fraudulent inducement, economic duress, but it also lacks consideration. Now, the court found that the consideration for that agreement was the agreement to guarantee. See, they could have terminated. By the time the second agreement was signed, was the first loan in default for failure to pay the 2% per month? No, they had paid. They were up to date. They had never missed a payment or were never even late on making a payment. And so when he signed that, I'm covering your question. Sure. Because when he signed that agreement, he was saying, okay, give me the documentation. Prove to me that this thing had a maturity date. Show me that there's another document. I have no other documents. Wasn't there a prior assertion by Bank of America? They said, okay, after you sign, then we're going to show it to you. Something to that effect? Yeah. They said, well, see, they were saying we're going to cancel the loan on August 5, 2009, and we're going to start legal action against you. And so here it is in late July or something. He says, well, okay. A small business, he employed 14 people. And this is where the economic situation comes into play. We were in a very bad economic situation. And that can't be the reason for the inducement. But when you add to that this wrongful conduct and they say you have to pay that all off by August 5, 2009, those are all the things that are going through a person's head, a small business owner's head, as to how do I deal with the situation I have here. The best thing for you to do at that point is to buy yourself some time. Let's try to figure this out. Let's try to figure out. Show me the documents that you have that show that this thing had a March 5, 2009 maturity date. Counsel, let me ask you, as far as the sanctions are concerned, how long was the time frame between your client asked for the information from the bank about the maturity date on the BOA line of credit? And it was never disclosed, right? Never? No other documentation supporting their contention that there was a date or supporting their belief that there was even a date. Didn't they actually say we have it? Yes. We're going to give it to you, but then they just said they didn't have it. Yes. It took they initially in an interrogatory said that all the LaSalle, what we refer to as the LaSalle LOCs, which my client's account was one of these type of accounts, they claimed that all of those accounts had what was called a term sheet and a maturity date on it. And so once they made that claim, which I think was sometime in 2012, it was an interrogatory response in 2012, we said, okay, show us some of those other accounts. Show us that these other accounts have maturity dates, because then we can understand if you've lost our term sheet and our maturity date, let's show us, prove that this claim that all of these accounts had maturity dates. That's why you believe they did. And that's when we finally pushed that issue of let's see this other documentation. We got a court order from a motion to compel to provide us some subset of accounts, of some information from those accounts so they could prove that other accounts had these maturity dates. That went on for about after the judge made that order. I think it was in September of 2012 or 13. I think it was 2013. It was, no, I think it was 2012. And in April of 2013, so it was several months, they said we're getting it, we're pulling it together. I think in April of 2013 they said we just need a few more days and we'll have it. And the judge gave them like another 20 days or something like that and said no more extensions. And then they came back and said, okay, we're willing to admit that none of them had maturity dates. And then the issue is, okay, why are you sitting here saying that you believed that they all had maturity dates? But the trial court's response to that was not that was sanctionable conduct. He said he denied the sanctions and then he said settle the discovery. Is that pretty much what the trial court did? The trial judge? Yeah. Well, the trial judge felt that because they were willing to admit that they had added maturity dates to all these accounts when they came over from Bank of America, I mean from LaSalle, that there was no reason to show us a bunch of documentation from these other accounts because they've already admitted to the situation. But the thing is they said, well, we believed it. And that's their whole thing. And you see it a lot in their response brief is we believed this date existed. All these accounts had these dates. And so we said, okay, that's part of our misrepresentation claim. Let us prove that you couldn't have believed it. None of the accounts had maturity dates. And that's why we continue to believe that. Let me focus on sort of that moment in time with a different kind of question. Okay. At that point, all right, when you have this dispute going on, did anybody think about settling this case somehow? Because now we're years later, we're already in the appellate court, and having spent five years doing nothing every single day but hear loan cases, all right, no bank in America ever loans money without a fee shifting provision. And now your client has racked up the potential for all these fees to pay Bank of America's law firms, all right? And at some point, you know, did anybody talk about pulling the plug and just trying to settle it? Did Judge Sherlock ever talk about trying to settle the case? Because now we're up to $100,000 in fees if I remember the record correctly. $50,000 or so, I think. $100,000 in total. Actually, when Judge Sherlock, no, the second judge, I'm sorry. Oh, Castiglione. Castiglione. When Judge Castiglione ordered them to provide the documentation that we had requested, some subset of it, he pulled down what we had requested and asked for less documentation. Then there was a request from the bank to settle. And so I think we went and we even paid to go to mediation. Oh, so you did go to mediation? Yes. Okay, which I take was unsuccessful. It was. Because when we got there, they weren't really in a position to settle. They said, no, you, you know, the maturity date was the maturity date and you didn't pay the money at that time and we didn't do anything wrong. And my client said, how can we settle? Counsel, let me ask you about the September 9th order then. September 9th. Okay, that was the order regarding the discovery. No, this has to do with the final ruling. Oh, okay. Yes. The final order. Court entered judgment against Drapes and the individual client in the amount of $100,000 and $3,000 against both, right? And some had to do with the amount owed on the line of credit. About $52,000, yes. And then the attorney's fees. And that was another $52,000, so I think it was a total of $103,000 or something like that. They were pretty well equal. Was there a fee petition presented at that time? Yes, as part of the final motion for summary judgment. Okay, so did you ever respond to the fee petition? We responded to the motion for summary judgment because what could I say about the fee petition seemed reasonable. It's $50,000 in fees. But our point is that they violated the agreement. They breached the agreement. So they can't come and ask for fees on something they had previously breached. So I could have said and argued and said, no, instead of $52,000, this should be $48,000 or $45,000. That seems like an exercise you go through, but it didn't make any sense at that point in time because the judgments in my mind were illogical. How can you say that they unilaterally added this majority date and yet at the same time say, well, you should have paid by that maturity date they assigned? None of that made any sense to me from a perspective, and none of it made any sense to my client, and I certainly couldn't explain it to my client. Did he make an offer to pay a certain amount that was rejected by the bank, your client? Did my client? Yes. In November of 2009, he offered to pay $750 a month, which was approximately 2% of the then outstanding balance. He offered to pay $750 a month until it was fully paid off. They rejected that because that would have seen at 2% a month, it would have been fully paid off by about January 2018 if he made the minimum payment every month. At $750 a month, that would have been slightly accelerated because the payments at $750 wouldn't have been interest, it would have been a little less. But in later years, it would have been more, the payments would have been, the $750 would have been higher than the payment. So I would assume, and I never calculated that out, but I assume that such an arrangement would have been, he would have been paid off by 2015 or some, 16, sometime earlier than 2018. But that was his argument from July 2009 to December 2009 when he was still trying to save his company was, let me at least pay the 2% a month or pay something that's reasonable. Don't demand from me the full payment. So he made that offer in November of 2009. It was rejected. They wanted the full payment. They at one time, I think, said the full payment by 2011 was the later, in the final agreement, it was August 2010. At one point, I think they might have offered to let it be paid off by 2011. But they rejected his offer at that point. Anything further? No, I haven't. Obviously, this has been going on for several years, so I could sit here and talk and talk and talk. But hopefully I answered your questions. I think the briefs are pretty thorough. All right, thank you. We'll call you back for rebuttal if Mr. Wilson has anything that you want to respond to. Mr. Wilson. May it please the Court. I'm going to deviate, I guess, a little bit from what I planned to say, but just draw the Court's attention to the fact that early in the case, when the first counterclaim was filed, Judge Taylor, who was here in the case, had dismissed all of the counts of the counterclaim with the exception of the misrepresentation claim. And I think as the Court has discussed with the Defendant's Counsel, there are certain elements that are required to be met for misrepresentation. And it was the Court's understanding and my understanding that there were these allegations that Mr. LaGosser had been deceived or somehow tricked into proceeding with this settlement agreement. So that count persisted for this extended period of time. You're talking about the fraudulent misrepresentation? Correct. Correct. Along the way, there was more than one settlement conference. The Court asked if there were settlement negotiations. There were. There was a mediation. I do feel compelled. What takes place in the mediation is not in the record and not appropriate here. But counsel had stated, not correctly, that we had appeared at the mediation, not prepared to settle the case, and that is just simply not a true statement. So my client was with me, and we were prepared, and we did undertake to negotiate without success. Mr. Wilson, at which point in the chronology did Bank of America finally admit that there was no maturity date on the loan? Good question. If we go back to October of 2000, I shuffled all my papers and my timeline is not here, I believe it was October of 2009, there was a letter sent to Mr. LaGosser, and that indicated that the agreement was not as the bank had been representing to him, that there wasn't this due date that was out there. So the case, and there was a settlement agreement. So one of our principal contentions, and as the trial court recommended. And was that before or after the second loan was signed? After the second loan was signed. Okay, good. What the defense is referring to is the second LOC. Why wasn't it disclosed sooner? As we repeatedly say, they were wrong. They didn't know. They didn't know. They weren't sure. But these were all the documents for the bank. How could the Bank of America not know if there was a maturity date or not a maturity date on the line of credit? How could that be, counsel? It was a LaSalle loan. I don't care. They bought them, right? They bought all the LaSalle loans. It was a merger of two massive corporations. And the billing materials get sent out. There are fields of data. Stuff gets put into the fields of data. All of the systems had to be transferred over from one system to another. So the people at Bank of America make certain assumptions. This is not in the record, but just intuitively to respond to the court's question. You have huge companies with individuals doing the work and different people doing it and going back and looking at it. So there are presumptions and assumptions. And the belief was at the bank, as we've indicated, that there must have been these term sheets. There must have been more materials. And after looking for something that the defendants knew didn't exist, it's important to know. Well, they didn't know what existed, did they? They didn't really know what the Bank of America had. They had no idea there was this due date all of a sudden, right? He testified that he knew that it was not a due date, unequivocally. Well, he was pretty sure, but how did he really know? Who knows what the bank had, right? They kept saying they had it, even during discovery. But that's not what he testified to. But again, for him to say, I know they don't have it, because he was pretty darn sure they didn't have it. But he didn't really know what the Bank of America had, did he? He said that. Well, I'm just saying, how would he know what the Bank of America is? Right. But what ends up happening is that my client ends up spending extraordinary amounts of time and effort looking for something that ends up not existing. Well, they said it did exist. Well, why was it hidden for such a long time and so convenient that they already get him to sign? So convenient, isn't it, that they realize this after he signs? Like I said, they drew his attention to it in October before he signed the settlement agreement. So that was drawn to his attention before the settlement agreement. They drew his attention to what? There's a termination date. There was a termination date. Which didn't exist. Correct. That's not fraud? It's not fraud if he doesn't rely on it. And it was disclosed prior to the settlement agreement. Didn't he sign a new agreement relying on the fact that he was threatened with a termination date? He did not rely on it. He testified that he did not rely on it. He testified that he knew that that was not. What did he do with it? Why would he sign a new agreement if he didn't think the loan was coming due and he was worried about his other people involved? He also testified that he wanted to get the other guarantors off the loan, which happened. Right, I understand that. And that was his testimony. Okay. And he said he wanted to get something out of it. And this has nothing to do with the termination date and maturity date. Nothing to do with that at all. Of course it's all relevant, but that's a negotiation process. He made an offer, as counsel referenced, he made an offer to actually pay more. The settlement agreement had lower monthly payments than what he'd offered. However, the bank, as indicated in the record, had one of those guarantees. So the bank agreed to release the guarantors, and now they're off the loan. Well, let me ask you about that. On page 13 of your brief, you make note that the second agreement was drafted so as to have the same guarantors, but Mr. LaDesseur refused to get the other guarantors to sign off. Notwithstanding that, the Bank of America still closed on the second loan, right? So the failure of the second guarantors to join didn't impinge on the validity of the second loan, right? I do not think that is correct. You say closed on the loan. No money was advanced. We'll call it a restructure. Restructure. So in the later letter, I believe it was referenced that the signatures were missing. Mr. LaDesseur wrote stuff on the paper, but they weren't signatures. So it didn't escape the bank's attention that it came back not fully executed. And that was part of those conversations. But the bank didn't take any action, saying this isn't our agreement. We're sending it back to the bank. If you don't want to use the word closed, that's fine. Right. As the defendants have recognized, the bank came back to them and said this doesn't work and wanted to do something different, which resulted in the second loan. But nonetheless, the bank has sued on the second loan, right? The underlying case. The settlement agreement incorporates the first and the second loans. Those are referred to as the loan documents, and it incorporates both of them. So it's a combination. It's not just the one document, if that answers the question. The court identified the damages issue. Contrary to the defendant's statement, there are not actually any damages asserted that have any nexus to what has happened. Well, does he allege damages in the counterclaim? Not with any nexus to the occurrences. Well, what damage did he allege? That his business was harmed because of the economy. That's all he alleged? Had nothing to do with this line of credit? Nothing? I don't believe that he said in his counterclaim that we wouldn't give him more money and it was because of that. That's not how it's styled. Well, didn't he say something? He tried to get money from other banks and they wouldn't give it to him because of this issue? Actually, I believe that he said he did get a loan from another bank, but it was too late. Okay. Okay, but so he's not complaining. The wrongdoing isn't that we wouldn't give him more money. The wrongdoing, the only wrongdoing alleged is that we told him something that wasn't correct. Okay. And that's been admitted. That was a mistake. And that was referred to prior to the settlement agreement. So the defendant, who wanted to get something, comes back, makes an offer in November, it goes back and forth, and in December, a settlement agreement, including a release, is executed. And that should, the release, absolve the bank of the things that happens in between. Now, even if you don't have that, Mr. LaDucere has been, I understand your point. Why would he do that? But he was beyond unequivocal. He was so certain in his testimony. He said it repeatedly. I was never fooled. I was never tricked. He said all of these things to make it 1,000% clear. He knew he didn't sign it, but how did he know with certainty that the bank wasn't going to produce something showing that he had agreed to it? The cause of action requires reluctance. And in view of the bank's action, he certainly would have reasonable doubt. What are they going to come up with? They must have something. Perhaps someone might have reasonable doubt, but that's not how he testified. He testified unequivocally that he didn't believe. Yeah, he didn't know. He didn't remember ever signing it. To his knowledge, he never did extend it. I mean, they never agreed on that on Maturity Day. Well, he did. But what's out there which would have led him to, with certainty, not suspect that the bank is going to come up with something? That could have been the case, but in this instance it wasn't. It just simply wasn't. A bank may be a very honorable institution in good business conditions, bad business conditions, but institutions and people do funny things. Fact of life. Fact of life. However, the cause of action does require belief and reliance, and we simply do not have that here. And all of the, you know, the Court recognized the extraordinary cost all derives, not all, significantly derives from proceeding under the expectation that there was reliance, because it's alleged. The defendant can allege that, but when it comes down to the point when he's deposed and he answers, and, of course, answers truthfully, which is the honorable thing to do. How could he have the knowledge of a Bank of America is what I'm saying, counsel. That just doesn't make any sense to me. He was testifying on behalf of the bank? No. From what he knew, there was no maturity date. That was his testimony, correct? Correct. So how can we use that in the reverse and against him, saying that he didn't rely on that? I don't understand that logic. He has to rely on the misrepresentation. He has to rely on the false statement. Right. But he didn't, and he said he didn't. And he says it on multiple occasions in multiple ways. There's no ambiguity. He's unequivocal in what he says. And, you know, facts could have been different, but they're not different. The facts are what they are. And he did not rely on this. And that's what these cases are. Why did he sign the modification agreement if he wasn't relying on this allegation by the bank that there was a maturity date? Why would he sign a modification agreement? To get his relatives off the agreement. And as the defendant's motion for stay without a bond referenced, he has no money and his company has no money. And that's in the motion for stay. Yeah, and those aren't damages? Anyway, whatever. Continue. But that's not damages resulting from the statement. I understand. Okay. Okay. I feel like the brief said all I wanted to say. It's already been overly perhaps belabored. But, you know, the case law with regard to this consideration and voiding of that second agreement, I don't feel is perhaps accurately related in the appellant's brief. The McCain case in particular, I just want to draw the Court's attention to, McClain at 412 does say in the absence of an expressed intention in the contract that the maximum, and this is in regard to the argument that the other guarantors released, absence of an expressed intention in the contract that the maximum amount of credit specified is to be limited on the amount of credit to be extended and an absolute condition of the guarantor's undertaking, the extension of credit beyond that amount does not discharge or release the guarantor of liability on that specified amount. So the guarantors would have been responsible for the underlying amount. And, of course, they were not released by virtue of this action. Nevertheless, we do agree that the modification released the guarantors. That was our agreement. And while we did have alternative claims in the counterclaim, in the event that the trial court had invalidated the document, the court, we believe, correctly ruled that that modification agreement was executed as the defendants agreed and admitted. And we respectfully pray that this court uphold the trial court's opinions. All right. Thank you, counsel. Mr. Hagan, rebuttal. Mr. Hagan, let me ask you the same question I asked Mr. Wilson at the beginning. Where in the line of chronology did Bank of America admit that there was not, in fact, some phantom document out there that imposed a termination date? Was it before or after the settlement agreement? It was after. Okay. Don, counsel mentions the October 2009 letter. This is discussed in our reply brief. And in that letter, Mr. Alonzo was arguing with the attorney about the fact that there was no maturity date. The attorney kept saying, yes, there was. We're getting the documentation. We're trying to find it, et cetera. Finally, I think it was October 2009, late October 2009, and I believe the letter is attached to his affidavit. The attorney came back and said, okay, we don't have the documentation. But he said that the loan was still being called on that date, on October 5th, that it had properly been called on August 5th, 2009, and continued to say that they either had to pay it off or sign the settlement agreement. So that attorney for Bank of America did say, basically, we can't find the documentation. So this is all discussed in the reply brief. But when they filed their lawsuit in the interrogatories that were filed in 2009, the bank continued to say all of these loans had maturity dates and term sheets. It wasn't until April of 2013 that they finally said, listen, it's in a motion for in lieu of complying with the judge's order, discovery order, in lieu of discovery, motion in lieu of discovery. I think it was filed in April of 2013. They said, we are willing to admit that none of the loans had maturity dates. They were all assigned maturity dates when they came over from the South Bank. But what you're telling us is that they're – I'm sorry, I'm sorry. That's all right. But what you're telling us is that Bank of America issued a sworn answer to an interrogatory in 2009, and they said there was, in fact, a termination date? They said that all of the loans of this type – it's a verified response to an interrogatory. I think it's noted in the response briefs, or in the original brief. They said that all of these – that they believed that these loans had maturity dates because all of the loans of this type had maturity dates and term sheets. And after, as I said, the point in the chronology where they finally, quote, admitted it, unquote, did they ever revise that answer to the interrogatory? Never did. Okay. And I believe I asked. And I believe I even – it's in the record. I know I asked the counsel, but I believe I asked, are you going to revise that interrogatory? But they never did. The only – the other thing that I think – so we talked about the October 2009 letter. And, again, that's described in our reply brief. Counsel referred to this as a – that this second LOC was a restructuring of the loan. It was simply adding a maturity date. They wanted a maturity date on it. So our big argument is not only was there fraudulent inducement, not only was there a breach of the original first LOC agreement, not only were there Illinois exterior fraud violations, and we feel there's RICO violations, but there was no consideration. The judge found the consideration for the second LOC was the bank's agreement that they would guarantee a fully operationing line of credit through October – August 5, 2010. There is absolutely nothing in the record supporting that. If he's reading that from the face of the document, the second LOC document, it says it is to the bank's discretion as to whether to give any further loans on the – on that particular line of credit. And my client's affidavit states that in August of 2009, so less than a month after he signed that agreement, they came back to him and said, we want you to sign another agreement that says you get no further advances. So there is – there's absolutely nothing in the record to support the consideration the judge claimed existed for that second LOC. And it's also our argument – now, in the response brief, the counsel has said that the second LOC was a nullity. So I think there's all kinds of issues about how can you modify a nullity. So if the modification signed in December – in December 2009 is a modification of the agreement signed in July 2009, they're saying that the July 2009 document was a nullity. How can you modify a nullity? But regardless, the court found and they claim that the consideration for the December 2009 modification settlement agreement was the release of the two guarantors – two of the guarantors. Well, I still believe as a matter of law, those two guarantors were released when they added that maturity date. In July of 2009 – it happened in October 2008. But in July 2009, when they stopped the first LOC, said we will set no more payments on it. It is due August 5, 2009. That's when they modified that agreement. And therefore, they released those two guarantors. And so they – Now we're leapfrogging, okay? So you're saying the bank incorrectly adds a term to the contract that didn't exist. Yes. And then somehow that released the guarantors. I mean, the bank may have done a really terrible, awful thing. But how does that release the guarantors if there's an existing debt? Because if a loan – if a loan agreement, the underlying loan – And if so, why doesn't it release Mr. Ledesor too? It did. It's our argument that it did from the guarantee signed for the first LOC. Now, he was the only one that signed a continuing guarantee in July of 2009. So our opinion is that the second LOC and the modification are void. They're unenforceable. And therefore, you have to go back to the first LOC. And the first LOC, by adding a term that didn't exist – and he brought it to their attention and said – And what law or doctrine do you rely on for that proposition that by adding a term that doesn't exist, that it voids the underlying debt? And that, again, is – Is it in the UCC someplace? Is it case law? No, it's case law. That in Illinois, if you – if the underlying agreement is modified, there's a material modification, the term – the maturity date on that document is a material term. But isn't – isn't just the – isn't the improperly added maturity date void, but not the underlying debt? No. Are you saying the assembly wipes away the – No, we're not the underlying – The slate and he owes nothing? Yeah, the underlying debt isn't. That's why count three – for example, count three is for the underlying debt against all about drapes on the first LOC. So that's not released. But – Okay. I need you to get to that point. Okay. Yeah, count four is about the three – is the three guarantors. And our position is that count four is – is – should be ruled in our favor because – So your position is that your client potentially would owe money under – the corporation would owe money under count three, but the three guarantors don't? Exactly. Okay. But now if you look at – if you look at count three of their claim, that's where our counterclaims come in for breach, breach of duty, Illinois Consumer Fraud Act. And so obviously if our counterclaims end up with a judgment, a damages judgment, it could be offset. You could be – you could argue that any judgment for all about drapes should be offset by the $35,000 outstanding balance. Now, I could argue that – I argued in our response brief, I believe, before the trial court, that because they breached the agreement in a material way, that they forfeited the right against all about drapes also. But that certainly is – would be debated. I mean, that's something we could argue about. But I think the counterclaims and the damages to my client, they at least have offset. Of all the mountains you have to climb, that might be the most difficult. What's that? We can admit that of all the mountains you have to climb, that one might be the most difficult. I'm sorry, which? Avoiding the entire debt against everybody. Absolutely. And the thing is, the company signed the agreement, the first LLC. They lived under that LLC for five years. They never missed a payment. They were never late in making a payment. They only stopped making payments when Bank of America said you can't make any more payments on that debt. Are there any other questions? No. All right. Thank you, counsel. The court will take the matter under advisement. And the court stands in recess.